IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:20-CV-699-LCB-LPA

| | | |
|---|---|---|
| WOODMONT WEST MARKET, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY,<br><br>Defendant | ) | PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, MICHAEL P. LESTER, P.E. |

Plaintiff Woodmont West Market, LLC ("Woodmont" or "Plaintiff"), in response to Defendant The Cincinnati Insurance Company's ("Cincinnati" or "Defendant") motion to exclude testimony of Michael P. Lester, P.E., respectfully shows the Court as follows:

CONCISE STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

Michael P. Lester, P.E., inspected the property at issue in this action, the West Market Shopping Center, located at 4653 West Market Street, Greensboro, NC ("the Shopping Center") on June 8, 2020. Mr. Lester prepared a report of his inspection signed on December 1, 2020, that Plaintiff provided in discovery. Plaintiff timely designated Michael P. Lester, P.E., as its expert on March 8, 2021, and Mr. Lester was deposed by Defendant's counsel on August 10, 2021, just before the deadline for the completion of discovery.

In his report, his expert witness designation, and his deposition, Mr. Lester, relying on a CoreLogic Wind Verification Report, statements of tenants, and statements of roofing contractors with first-hand personal knowledge of the conditions observed on the roof before and after October 31, 2019, testified that wind caused damage to the roof of the Shopping Center.

Mr. Lester's opinions meet the *Daubert* standard required under Fed. R. Ev. 702 and 703, and the jury should be permitted to give the appropriate weight to that testimony at trial.

## CONCISE STATEMENT OF THE FACTS

This case arises out of an October 31, 2019 storm that passed over a shopping center owned by Plaintiff and located at 4653 West Market Street, Greensboro, North Carolina ("the Shopping Center"). [D.E. 2, ⁋ 1, 5-6, 13]. On October 31, 2019, the Shopping Center was insured by a policy of insurance issued by Defendant, the Cincinnati Insurance Company, bearing policy number EPP 036 05 22 ("the Policy"). [D.E. 2, ⁋ 7-11]. The parties disagree as to whether the October 31, 2019 storm caused damage to the Shopping Center. Defendant denied Plaintiff's claim for coverage under the Policy, contending that the damage reported was not caused by wind or some other hazard insured by the Policy and thus the Policy did not provide coverage. [D.E. 2, ⁋ 30]. Suit in this matter was filed on June 25, 2020. [D.E. 2]. Because the parties disagreed, Plaintiff, pre-suit, hired Mike Lester to conduct an inspection and determine the cause of the damage reported to Plaintiff by its tenants. [D.E. 23-3].

The following facts, however, are not in dispute:

- Mr. Lester inspected the roof of the Shopping Center on June 8, 2020, accompanied by Miles Standish with Coastal Construction Design. [D.E. 23-3, p. 2 of 17];
- Prior to conducting his inspection, Mr. Lester ordered a CoreLogic Wind Verification Report, showing that on October 31, 2019, the highest estimated wind speed at the Shopping Center was 63 miles per hour. [D.E. 23-3, p. 13 of 17];

- On December 19, 2019, Richard Walls, an employee of Defendant and the adjuster assigned to Plaintiff's claim ordered a CoreLogic Wind Verification Report for the Shopping Center ("CoreLogic Report"). [Ex. A, Walls Depo., pp. 80-81, Depo. Ex. 2];
- Mr. Walls ordered the CoreLogic Report "[t]o get another estimate or opinion on the wind speeds … to see if there is another opinion on what the wind speeds were." [Ex. A, Walls Depo., p. 81];
- Mr. Walls estimated that he previously ordered 50 CoreLogic Wind Verification Reports prior to ordering the CoreLogic Report at issue in this case. [Ex. A, Walls Depo., pp. 81-82];
- Mr. Walls believed that the CoreLogic Report provided "some accurate information" and that it did "confirm that wind occurred on a certain day." [Ex. A, Walls Depo., p. 83];
- CoreLogic is an approved vendor of Defendant that adjusters employed by Defendant have to use "as they feel need or is necessary." [Ex. B, Cincinnati 30(b)(6) Depo., p. 71];
- Cincinnati sees a CoreLogic Wind Verification Report as a tool. [Ex. B, Cincinnati 30(b)(6) Depo., p. 72];
- From Mr. Lester's understanding from his research is that CoreLogic has a huge database and utilizes weather observation station data plus radar data to derive probable wind speeds for any given site. [Ex. C, Lester Depo., p. 42];
- CoreLogic, to Mr. Lester's knowledge, is widely accepted and in his experience tends to reflect actual conditions at a site. [Ex. C, Lester Depo., p. 45];

- Like Defendant's employee, Mr. Lester had experience using a CoreLogic Wind Verification Report in investigating other losses prior to inspecting the Shopping Center. [Ex. C, Lester Depo., p. 47];
- The CoreLogic Report was one of the data points used in Mr. Lester's analysis of the damage reported at the Shopping Center, along with reports of downed trees, and reports of tenants, to conclude that there was wind sufficient to cause damage to the roof. [Ex. C, Lester Depo., pp. 47-48];
- Mr. Lester also based his opinion of wind damage resulting from the October 31, 2019 storm on photographic documentation provided to him by Coastal Construction. [Ex. C, Lester Depo., p. 48];
- Coastal Construction AND George Palamaris testified, from first-hand observations that the October 31, 2019, storm event caused damage to the roof of the Shopping Center. [Ex. D, Palamaris Depo., pp. 72-73, 89, 91-92; Ex. Coastal Depo., pp. 28-29, 31, 38, 43, 46-47, 49-52, 55];
- During his inspection of the Shopping Center on June 8, 2020, Mr. Lester spoke with tenants who reported that after the October 31, 2019 storm, there was a marked increase of water intrusion. [Ex. C, Lester Depo., pp. 49-50, 52];
- Mr. Lester formed his conclusion that the wind speed at the Shopping Center was consistent with the CoreLogic Report and that there was probable wind damage at the Shopping Center based on his discussions with four tenants of the Shopping Center, trees downed in the area, and the photographs provided by Rimkus (Defendant's engineer) and Coastal Construction. [Ex. C, Lester Depo., p. 52];

- Mr. Lester was able to conclude that the roofing of the Shopping Center was damaged by wind without knowing exactly what the wind speed was. [Ex. C, Lester Depo., p. 53];
- Mr. Lester testified that NOAA weather data, if not proximate to the site, is not reliable. [Ex. C, Lester Depo., p. 54];
- CoreLogic developed its proprietary wind verification science for the benefit of insurance carriers like Defendant. [Ex. F, Lester Affidavit, Ex. A];
- Defendant's engineer, David Zimpel, testified that it was appropriate for Mr. Lester to rely on the photographs taken by others in forming his conclusions. [Ex. G, Zimpel Depo., pp. 199-200];
- With regard to Mr. Lester using a CoreLogic Wind Verification Report, Defendant's engineer testified that "every engineer has their own bases you know. That is fine." [Ex. G, Zimpel Depo., p. 201]

## STATEMENT OF THE QUESTIONS PRESENTED

Defendant's motion to exclude raise two important questions:

I. Whether a tool used by Defendant, engineers in conducting loss investigations, and designed to provide through proprietary means, accurate and reliable information to insurers like Defendant is a sufficient factual basis for Mr. Lester to rely upon, along with additional reliable facts and evidence, to form his opinions in this case.

II. Whether an incorrect statement of law proffered by Defendant's counsel in support of its motion is relevant at all to the jury's ultimate determination of how helpful or how much weight to give Mr. Lester's expert opinions and testimony.

## ARGUMENT

### I. MR. LESTER'S OPINIONS ARE BASED ON SUFFICIENT FACTS AND RELIABLE DATA, INCLUDING THE CORELOGIC REPORT.

Under *Daubert* and *Kumho Tire Co.*, meeting the requirements of Rule 702 means showing that a proposed expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). To be relevant, the proposed expert testimony must appear to be helpful to the trier of fact. *Daubert*, 509 U.S. at 591-92. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Factors affecting an expert's reliability include the expert's qualifications as well as (1) whether a theory or technique can be and has been tested; (2) whether a theory has been subjected to peer review or publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community." *Kumho*, 526 U.S. at 149-50.

#### A. Mr. Lester Is Imminently Qualified to Offer Opinions Regarding the Cause of Damage to the Shopping Center Roof.

Regarding Mr. Lester's qualifications, he has been a registered Professional Engineer since 1990. [Ex. H; Expert Witness Designation, Ex. B]. He earned his Master of Civil Engineering in December of 2007. [Ex. H; Expert Witness Designation, Ex. B]. Since 1994, Mr. Lester has worked providing engineering consultation, investigation and analysis regarding:

- Grading and drainage

- Blasting and vibration
- Structural failure and collapse
- Foundation failure
- Building materials defects
- Building roofing and cladding
- Fires and explosions
- Traffic accident reconstruction
- Products and consumer goods, and
- Construction/personal injury cases

[Ex. H; Expert Witness Designation, Ex. B].

Mr. Lester's resume lists thirty-four (34) separate "Other Courses & Training" from his career, taken in addition to his coursework to obtain a Masters degree. [Ex. H; Expert Witness Designation, Ex. B]. He listed ten (10) "Publications, Seminars and Presentations" and cited membership in eight (8) Professional Associations. He testified seven times in the last four years, and in his career 14 times at trial as an expert, and in 49 depositions. [Ex. H; Expert Witness Designation, Ex. C]. He is imminently qualified to investigate and determine the cause of the damage presented to him at the Shopping Center in this case.

B. Mr. Lester's Opinions Are Based Upon Reliable and Generally Accepted Evidence Regularly Utilized By Engineers, Including Defendant's Engineer and Defendant.

Regarding the reliability of his opinion, and specifically the CoreLogic Report, Defendant's motion asserts that the information is unreliable and inadmissible consistent with the test outlined in *Kumho*. That argument forgets, as Defendant apparently forgets, that the opinion offered by Mr. Lester is not wind speed, but wind damage. [D.E. 23-3, p. 1 of 17]. Mr. Lester

testified and wrote in his report that he used the CoreLogic report, along with other evidence to reach his conclusion that wind from the storm on October 31, 2019, damaged the roof of the Shopping Center. [D.E. 23-3].

**Weather Research**

I collected climatological data from various sources[15,16,17], including wind and rainfall events at the site for October 2019. Records reflect rainfall on October 30 and 31, 2019, at 1.5 inches and 0.73 inches, respectively. While significant, these daily totals are not atypical for daily totals in this locale. The Rimkus report related and NOAA data for the Piedmont Triad International Airport affirms a wind gust of 43 MPH on October 31, 2019. The Rimkus report notes the airport located 4.6 miles from the incident site. Experience shows that when the distance between an incident site and the reporting station is of that magnitude (nearly 5 miles) the reported gust might not be representative of actual gusts at the site. This is especially true with thunderstorm (and tornadic) activity. A wind gust reported in one storm event database was 50 knots, which converts to 57.5 MPH, with storm start and end times of 5:20 p.m. and 5:50 p.m., respectively. I also obtained a site-specific wind report[18] that reflects wind events meeting a 40 MPH threshold since January 2009. That report reflects wind gusts on October 31, 2019, of 63 MPH at the site, 64 MPH within 1 mile of the site, and 67 MPH within 10 miles of the site. So, the 64 MPH is significantly higher than the 43 MPH wind assumed in the Rimkus report. Noteworthy is the fact that in fluid dynamics wind pressure is proportional to the square of the wind speed. Accordingly, a 63 MPH gust will produce 2.1 times the pressure on building components than a 43 MPH gust.

---

[12] West Market – Woodmont Greensboro Tenants (see Appendix A)
[13] BUILDING2FACETG10.png
[14] BUILDING2FACETH12.png, BUILDING2FACETH13.png
[15] https://www.ncei.noaa.gov/
[16] https://www.ncdc.noaa.gov/stormevents/
[17] https://www.wvs.corelogic.com/
[18] CoreLogic Wind Verification Report #9960141 (See Appendix A)

[D.E. 23-3, p. 4 of 17].

Rather than limiting his weather research to a single source within NOAA like Defendant's expert, Mr. Lester noted two [substantially] different NOAA reports, including a second report demonstrating a wind speed of 57.5 miles per hour in Greensboro, which closely correlates with CoreLogic's "proprietary Wind Verification Science" estimated wind speed at the Shopping Center of 63 miles per hour. [Ex. F, Lester Aff., Exhibit A, p. 5 of 12]. Mr. Lester then attempted to verify the weather research with reports of downed trees, observations of roofing contractors, and reports of tenants who advised him of copious interior intrusion only after the October 31, 2019 storm event. [D.E. 23-3, p. 5 of 17].

Although his inspection came after substantial repairs were performed on the Shopping Center's roof, Mr. Lester reviewed photographs of damage taken by Coastal Construction to reach his conclusions, something which Defendant's own expert is "fine". [Ex. G, Zimpel Depo., pp. 199-200]. While Mr. Lester and Defendant's expert may reach different conclusions, they do not disagree with respect to the methodology each followed in reaching their conclusions. Moreover, even though Defendant argues the evidence Mr. Lester relied upon was insufficient, "the court cannot substitute its judgment for that of the expert as to what is sufficient evidence to inform his experiential conclusion." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F.Supp.3d 579, 590 (E.D.N.C. 2015). The remedy there is cross-examination, as the Court's gatekeeper role is not to supplant the adversary system or the role of the jury, as "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

During Plaintiff's evidence, for example, Plaintiff should be able to present evidence controverting a number of inaccurate items asserted in Defendant's Memorandum of Law in support of its motion to exclude Mr. Lester. First, regarding Defendant's contention that "Plaintiff's roofer, Coastal Construction, is the *sole person* Plaintiff has identified with first-hand knowledge of the damage the Weather Event purportedly caused." Plaintiff will be able to present evidence to the contrary in the testimony of George Palamaris who testified that he was at the Shopping Center on October 31, 2019. [Ex. D., pp. 72-73]. Mr. Palamaris will be able to testify that he found damage – specifically a "leak, a failed seam. This was a gust of wind. In my opinion I think it was wind gusts had come up." [Ex. D., pp. 72-73]. He remembered the storm, and he found a leak that needed to dry out before it was repaired. [Ex. D, p. 89]. When

asked by Defendant's counsel whether weather damaged the roof of the shopping center on October 31, 2019, he responded with "I'm going to say yes." [Ex. D, p. 91]. When asked what evidence he had to substantiate that, Mr. Palamaris testified:

> **Q. And I understand what you're saying. What do you have to substantiate that?**
>
> A. I lived here. It was a freaking nightmare. We had storms and wind from hell.
>
> **Q. What damage to the roof took place on October 31st, 2019?**
>
> A. Again, I can't put you on -- I know that particular -- there's a time span there that goes without a doubt that it blew the coping off the building. It blew the rubber back, it was severe wind, lots and lots and lots of rain. I mean, you know, you can't put that on one day. We're talking months of rain. It rained like it was Biblical.
>
> **Q. Okay. So you cannot identify exactly what damage, if any, occurred on the roof of the shopping center on October 31st, 2019 specifically?**
>
> A. Not on that one specific date, no, no. I mean --
>
> MS. SMITH: I don't have any further questions for you unless Mr. Crook has any redirect. He may ask you a few questions.

[Ex. D, p. 92].

Mr. Palamaris' testimony conforms with the testimony of Coastal Construction, and further supports Mr. Lester's opinion that wind caused damage to the roof of the Shopping Center.

Defendant's argument highlighting that there were already leaks in the roof also ignores the actual testimony of Britt Treece, who testified that he did not find any open seams in his inspection, or puncture marks at the time of his inspection in July of 2019. [Treece Depo., pp. 70-71, p. 90]. It was not, as Defendant contends, that the conditions documented by Mr. Treece are what Plaintiff seeks to recover from Defendant – it is the damage that Mr. Treece did not find, i.e., open seams and punctures, subsequently documented by Mr. Palamaris and Coastal that affirms and supports Mr. Lester's expert opinions.

Defendant's reliance on Mr. Lester's inability to assign a "predominant" cause as a basis for the exclusion of his testimony also demonstrates an incorrect understanding of the applicable law. The use of the term "predominant" comes from a headnote summary of language in *Wood v. Michigan Millers Mut. Fire Ins. Co.*, 245 N.C. 383, 96 S.E.2d 28 (1957). Defendant cites the headnote summary using the term "predominant" – not the opinion's holding utilizing the term "proximate", in support of their motion to exclude Mr. Lester's testimony – presumably for being "unhelpful". [*See* Ex. J]. First, the actual holding from *Wood* requires only that the windstorm be "of sufficient violence to be the efficient and <u>proximate</u> cause of the damage." *Id*. at 386, 96 S.E.2d at 30. Second, the policy in *Wood* was not an "all-risk" policy, but a "named peril" policy, unlike the Defendant's policy issued in this case. *Wood* at 384, 96 S.E.2d at 29. Third, under an "all-risk" policy, the actual controlling law is "when an accident has more than one cause, one of which is covered by an 'all risks' insurance policy and the other which is not, the insured must provide coverage". *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 547, 350 S.E.2d 66, 74 (1986). As a consequence, it is Defendant's reliance on what is "predominant" that is truly unhelpful and should be excluded.

It is not the role of this Court to determine that the proferred expert testimony is irrefutable or certainly correct. *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006). The focus of this Court's inquiry should be on the "principles and methodology employed by the expert, not on the conclusions reached." *Id.* at 431. Defendant's expert did not object to Mr. Lester's methodology in the development of his opinions. The methods, including investigating all available sources of information, speaking to witnesses, and reviewing available photographic evidence is a reliable methodology, and follows the same methodology described by Defendant's expert – they simply disagree as to whether the damage was the result of wind. [Ex. I, Rimkus Report].

Mr. Lester's principles and methodology, including the sources consulted in forming his opinion, were reliable, and as a consequence, the jury should be permitted to evaluate his testimony.

II. MR. LESTER'S TESTIMONY WILL BE HELPFUL FOR THE JURY.

"Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). To be an expert, a witness "must possess some specialized knowledge or skill or education that is not in the possession of the jurors." *United States v. Perkins*, 470 F.3d 150, 155-56 (4th Cir. 2006). If the proposed testimony will recount or employ "scientific, technical, or other specialized knowledge," it is a proper subject for expert testimony. *Kopf*, 993 F.2d at 377.

As stated above, Mr. Lester is a licensed Professional Engineer, with more than twenty-five years experience in moisture intrusion and building roofing and cladding investigations. He has years of experience in conducting inspections of commercial roofs, and applying scientific

methods and concluded that the winds of the storm on October 31, 2019 were of sufficient severity to cause damage and moisture intrusion into the interior spaces of tenants of the Shopping Center. His analysis of wind speeds, fluid dynamics and wind pressure are all outside of the everyday knowledge and experience of a lay juror. Mr. Lester relied on his experience in roofing systems, failure investigations, and the materials identified in his report to conclude that the October 31, 2019 storm "was capable of and did cause unique damages to the roofing, including punctures and membrane seam separations."

Experts are permitted to summarize certain evidence, including evidence presented earlier at trial so long as the expert relates that testimony to his or her specialized knowledge. *United States v. Johnson*, 54 F.3d 1150, 1157 (4th Cir. 1995). Mr. Lester's testimony, based on his specialized knowledge, training, and experience, will be helpful to explain to the jury why and how the conditions reported on the Shopping Center roof, before and after the storm, correlate with documented wind speeds measured on October 31, 2019. His testimony therefore meets the standard required by Fed. R. Ev. 702, and should be admitted.

## CONCLUSION

Mr. Lester's opinions and proposed testimony satisfy the requirements of *Daubert* and *Kumho Tire,* and the jury should be allowed to consider it in making a decision in this case. Therefore, Defendant's Motion to Exclude Mr. Lester's testimony should be denied.

Respectfully submitted, this the 22nd day of October, 2021.

BAILEY & DIXON, LLP

By: /s/ J.T. Crook
J.T. Crook, N.C. State Bar No. 35232
Attorney for Plaintiff
Post Office Box 1351
Raleigh, NC 27602-1351
Telephone: (919) 828-0731

Facsimile: (919) 828-6592
Email: jcrook@bdixon.com

CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of October, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

T. Nicholas Goanos
Khrystyne Rasmussen
Butler Weihmuller Katz Craig LLP
11605 N. Community House Rd, Suit 150
Charlotte, NC 28277
Email: ngoanos@butler.legal
ksmith@butler.legal

This the 22nd day of October, 2021.

BAILEY & DIXON, LLP

By: /s/ J.T. Crook
J.T. Crook, N.C. State Bar No. 35232
Attorney for Plaintiff
Post Office Box 1351
Raleigh, NC 27602-1351
Telephone: (919) 828-0731
Facsimile: (919) 828-6592
Email: jcrook@bdixon.com